**HARPER & ROW, PUBLISHERS, INC.
and the Reader's Digest Association,
Inc., Plaintiffs,**

**v.**

**NATION ENTERPRISES and the Nation
Associates, Inc., Defendants.**

**No. 80 Civ. 0856 (RO).**

United States District Court,
S.D. New York.

Feb. 16, 1983.

---

Edward A. Miller, New York City, for plaintiff Harper & Row, Publishers, Inc.

Cowan, Liebowitz & Latman, P.C., New York City, for plaintiff The Reader's Digest Ass'n, Inc.; Roger L. Zissu, Robert J. Bernstein, Jane Ginsburg, New York City, of counsel.

Cahill, Gordon & Reindel, Andrew L. Deutsch, American Civil Liberties Union, New York City, Leon Friedman, Hofstra University School of Law, Hempstead, N.Y., for defendants; Floyd Abrams, Devereux Chatillon, Carol E. Rinzler, New York City, of counsel.

## OPINION AND ORDER

OWEN, District Judge.

Defendants Nation Enterprises and The Nation Associates, Inc. publish The Nation which is perhaps America's oldest continuously published weekly magazine. On a day in late March, 1979, an undisclosed "source" put The Nation's editor, Victor Navasky, into unauthorized possession of a draft of former President Gerald R. Ford's memoirs. This draft was the fruit of close to two years work by Ford and his assistant Trevor Armbrister, a senior editor of Readers Digest and himself an author of books.[1] Navasky knew the memoirs were to be published shortly in book form by plaintiffs Harper & Row Publishers, Inc. and The Readers Digest Association, Inc. with cer-

tain prepublication rights in Time magazine. However, believing that the draft contained "a real hot news story"[2] concerning Ford's pardon of former President Nixon, as well as lesser news, Navasky spent overnight or perhaps the next twenty-four hour period quoting and paraphrasing from a number of sections of the memoirs. Navasky added no comment of his own. He did not check the material. As he later testified, "I wasn't reporting on the truth or falsity of the account; I was reporting the fact that Ford reported this. . . ." Part of Navasky's rush apparently was caused by the fact that he had to get the draft back to his "source" with some speed.

The Nation article, which appeared on the newsstands on April 3, 1979, is somewhat over two thousand words in length, and is set forth hereafter as Appendix A. The major part, as can be seen, details Ford's recital of the events of the pardon of former President Nixon beginning with the time General Alexander Haig, then President Nixon's White House chief of staff, first mentioned a pardon as an option in connection with a resignation, and ending long after the granting of the pardon when President Ford, out of compassion, went to visit the desperately ill ex-President Nixon.

The Nation article also repeats vignettes about Henry Kissinger, John Connally and David Kennerly, a White House photographer. It includes Ford's Presidential reminiscences of Nelson Rockefeller, Ronald Reagan, and Edward Bennett Williams and his recital of the circumstances surrounding his decision to run again for the Presidency. The Nation article closes by relating in some detail Ford's observations of Nixon's character.

■ The memoirs were shortly thereafter published under the title "A Time to Heal" and were, at the time of The Nation article,

1. The preparation involved not only consideration of a "mountain" of documents, but interviews with numerous third-parties. The Ford-Armbrister dialogues and third-party interviews, transcribed from tape recordings, ran over 6000 pages.

2. Navasky deposition at 36.

protected by copyright.[3] Editor Navasky knew this. The article was therefore an infringement of that copyright, unless otherwise privileged.

■ The Nation endeavors to justify its use of the material under the "fair use" doctrine[4] on the theory that the content of the Ford memoirs was "news"[5]—indeed, that aspects of the Nixon pardon were "hot news."

The doctrine of fair use, which emerged through the common law is now codified in the Copyright Act of 1976, 17 U.S.C. § 107. The statute reads:

Notwithstanding the provisions of Section 106, [17 U.S.C. § 106,] the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose or character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

Under these guidelines, the inquiry, as I perceive it, is whether The Nation's article was "news reporting", and if so, was a "fair use" of the materials taken.

Even were I to accept defendants' broadest statement of what was "news" in the Nation article, that news would be no more extensive than the following:

MR. NAVASKY: The news, in my judgment, was that President Ford had had a conversation with Alexander Haig that was possibly an impropriety at the highest level of our government because it suggested there was possibly an obstruction of justice[6] in the transaction and in

---

**3.** There is no dispute that this is a literary work, 17 U.S.C. § 102(a)(1), and that the publishing agreement between Ford and plaintiffs was appropriately recorded, 17 U.S.C. § 205(d).

**4.** The Nation further urges that it was justified in publishing the article notwithstanding copyright, by reason of certain rights under the First Amendment. While there may be a circumstance in which the First Amendment provides a defendant with greater protection than the fair use doctrine, this is not, in my judgment, one of them. Thus my inquiry is limited solely to the applicability of the doctrine of fair use. *Roy Export Co. v. Columbia Broadcasting System, Inc.,* 672 F.2d 1095, 1099–1100 (2d Cir.1982).

**5.** In this regard Navasky, subsequent to the publication of the article, acknowledged that he had been mistaken as to the "news" aspect of this information. This mistake was caused by his failure to ascertain all that had been revealed in the Congressional hearings in 1974. It is obviously no excuse for a copyright violation that an editor does not remember that something has been front page headlines. I also note that, according to one of The Nation's own witnesses, a failure to check is poor journalism. *Cf., Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976) (where-

in the Supreme Court in a defamation action held a publisher to a duty of due care in checking the factual accuracy of certain statements made about a private figure.)

**6.** This theory, as Navasky acknowledged on the trial, was sheer speculation. The colloquy went as follows:

THE COURT: But the fact that was revealed in 1974 was that he had the conversation with Haig, and Haig left without getting any response. That's where you say you saw the potentiality of an obstruction of justice.

MR. NAVASKY: That's correct. . . .

THE COURT: That, too, is an undisputed fact. The only question that is open is in the meantime whether or not he, on his own, or he, at the suggestion of some aide came to the view that the phone call to Haig should be made.

Now, I am saying to you what difference does it make whether on his own he came to that view or whether some aide called it to his .attention and said, "Mr. Vice-President, you better disavow this because the implications are ones that are troublesome."

What's the difference?

MR. NAVASKY: . . . I think the difference is that there is a third possibility which you haven't mentioned. . . . There is the

the story, and what was particularly newsworthy, having said that, was that in the book there were documents that Ford quoted from that, as far as I was aware of at the time—I have since discovered that they are in the Congressional Record—were being published for the first time that confirmed his account.

\* \* \* \* \* \*

In addition, the thing that was so striking to me was the written statement that Ford read to Alexander Haig after his conversations with his aides, saying that he has no intention of recommending what the President should do about resigning or not resigning after they had had a conversation the previous day on that matter. Navasky deposition at 37–9.

At no time did Navasky believe that the rest of the memoirs contained "hot news".[7] Moreover, he was aware that once the book was published there would be no news value in any of the material.[8]

■ More importantly, it is now conceded even by defendants that the "hot news" revealed in the article was not the revelation that Navasky believed it was when he testified on his deposition. What Navasky on that March day in 1979 thought was "hot news" about the pardon in the Ford memoirs had in fact been the subject of detailed testimony by President Ford in an unusual personal appearance before a Congressional Committee in 1974 which, needless to say, had been blazoned by the press.[9] Given the

---

possibility that this second conversation, after talking to his aides, was made for the record pro forma so that he could say he put in that there was no deal when in fact there may have been a third phone call to General Haig, which none of us know about, or a private conversation with General Haig saying for the record I am going to read you this statement but you go ahead and proceed as planned.

Now, I raise that third possibility, and I did not raise it in the article because it's remote enough that I didn't feel comfortable. I did not have a chance to go back to the record—

THE COURT: And you have no evidence?

MR. NAVASKY: I have no evidence, except I have the statements of these three aides which to me—I was as troubled by them as they were troubled by Ford's silence—and to me that is appropriate news in the politics of 1979, because you have two candidates for the Presidency of the United States who might have been involved in a deal, and you, your Honor, don't accept this as proof that they are involved in a deal, I don't invoke it as proof that they were involved in a deal, but I do see it as raising the possibility that they were in a newsworthy enough context that I reported it.

THE COURT: Can I ask you whether it occurred to you that equally with your theory it was entirely possible that Ford was thunderstruck at what Haig said to him and was frankly just sitting there listening, taking it in?

MR. NAVASKY: Your Honor, it did—

THE COURT: And after Haig had walked out he then began to assess the pieces and put them together. Is that entirely possible?

MR. NAVASKY: That is entirely possible.

Trial transcript at 508–12.

**7.** Navasky deposition at 83–4.

**8.** Navasky deposition at 48–9.

**9.** At the trial, Navasky asserted that the "hot news" in his article was (1) that an aide of Ford pointed out to him the risk of not responding to Haig's "pardon option" and (2) that Ford's subsequent response to Haig over the telephone was read from a written statement. It had become clear by this time that what he had believed in March, 1979 was "hot news" was not. The following is illuminative.

THE COURT: ... Starting with your deposition, you are asked, I take it, why in writing the story you say that the account of the Nixon pardon contains significant new detail which obviously made it newsworthy, right?

MR. NAVASKY: That's right.

THE COURT: At your deposition, at pages 86 and 87, you are asked what was the new detail. You recite that the new detail is: one, the Ruth memorandum; two, the statement Ford read over the phone to Haig; and three, the fact he hadn't told Haig he thought it would be improper to offer to pardon Nixon in exchange for Nixon's resignation at the time they had the original discussion.

Those are the three new details that you said when questioned on April 3, 1981 were those that you regarded as newsworthy. What [plaintiffs' counsel] is saying to you, and I gather you acknowledge, that each of those new details was in fact revealed somewhere: The Ruth memorandum in the Jaworski book; the statement to Haig in the Hungate hearings; and the conversation with Haig earlier, also in the Hungate hearings.

So we are at the point where in fact none of these revelations are in fact new because they have all been revealed somewhere. They were new, perhaps to you, but they were not new in the journalistic view. Right?

foregoing, I conclude that the "revelations" of the Ford memoirs were not such news, "hot" or otherwise, as to permit the use of author Ford's copyrighted material.

■ Assessing the "fair use" factors, I conclude here, too, that none of them provide The Nation with the absolution it seeks. First, the article was published for profit. Second, the infringed work was soon-to-be published. Third, The Nation took what was essentially the heart of the book,[10] and fourth, the effect of The Nation's extensive use of the Nixon pardon material caused the *Time* agreement to be aborted and thus diminished the value of the copyright.[11]

As was stated so simply and effectively by Justice Story in *Folsom v. Marsh,* 9 F.Cas. 342 (C.C.D.Mass.1841) (No. 4901), in a case involving one Jared Sparks who published in book form certain official and other papers of George Washington:

> [N]o one can doubt that a reviewer may fairly cite largely from the original work, if his design be really and truly to use the passages for the purposes of fair and reasonable criticism. On the other hand, it is as clear, that if he thus cites the most important parts of the work, with a view, not to criticize, but to supersede the use of the original work, and substitute the review for it, such a use will be deemed in law a piracy.

9 F.Cas. at 344–45.

Upon the failure of their fair use defense, defendants are left with one final conten-tion. The Nation asserts that three catego-ries of materials in the Ford memoirs are not copyrightable: (1) the recitals of histor-ical facts, (2) the texts of government mem-oranda prepared by individuals other than Ford, and (3) the quoted conversations of persons other than Ford. The Nation con-tends now that given the non-copyrightabil-ity of these materials, its taking of copy-rightable material was of such modest com-pass as to be excusable under the law.

■ Without question, defendants are correct in their assertion that the historical facts and the memoranda prepared by oth-ers are not *per se* copyrightable by Presi-dent Ford. However, these facts and mem-oranda were of interest to The Nation only to the extent that The Nation could set forth Ford's views about them or the man-ner in which Ford said his life had been affected by them. The Nation certainly had no interest in presenting these histori-cal facts and memoranda in isolation. Rather, it is the totality of these facts and memoranda collected together with Ford's reflections that made them of value to The Nation. Correspondingly, it is this same totality that is protected by the copyright laws.

This principle governs the portions of Ford's memoirs reciting the statements of individuals other than Ford as well. I de-cline to enter the thicket of deciding which statements were exact quotations—and

---

MR. NAVASKY: That is true, your Hon-or.

Trial Transcript at 488–89.

10. The Nixon pardon material was the very part for which *Time* was willing to pay $25,000.

11. The Nation observes that, notwithstanding the publication of its article, *Time* was still willing to publish had plaintiffs been willing to let *Time* advance the date of publication one week. Plaintiffs, however, declined on the ground that it made the interval between the *Time* publication and the book being available in the stores too long. As Irwin Gilkes, then with Harper & Row, testified:

> [I]f the period of time between the publici-ty of the book and the availability of the book is too long, and this is extremely delicate and very much a question of one's judgment and

sense of the book itself, if that time is too long, then the public when the book appears in the book stores feels that, well, I know all about this, this is really no reason to spend $13.95 or whatever, to read the book, be-cause there has been so much written about it that all the best parts are things I know about already, and well, there is a sort of psychological set that gets on with whatever has happened since, something newer, since we are always bombarded with something newer. Trial Transcript at 142.

This position does not seem to be unreason-able, and I therefore decline to second-guess plaintiffs' business judgment in this regard on the basis of expert testimony to the contrary proffered to me by The Nation.

therefore not protected by copyright[12] —and which were merely reconstructions of statements pieced together by Ford—and therefore copyrightable.[13] I suspect that most were to some degree reconstructions. Suffice it to say that, simply viewed, I regard the historical facts, memoranda, and statements as integral and necessary components of the context of Ford's revelations as to his state of mind while involved in governmental affairs of the highest consequence.

 Finally, plaintiffs request an award of their attorney's fees incurred in prosecuting this action. While this might be an appropriate situation for the award of fees, I am constrained by statute to disallow the application.[14] Under the Copyright Law, set forth in the footnote, an award of fees is not available where memoirs, *which have not yet been published,* have been copied. I note from the legislative history of § 412 that Congress sought to induce authors to register works for copyright— and thus make them available to the public at large—by making the remedy of attorney's fees available to one who has published and registered for copyright and, on the other hand, denying it to one who has not. Congress, in § 412(2), did envision—and provide for—the unusual situation where "newsworthy or suddenly popular works may be infringed almost as soon as they are published, before the copyright owner has had a reasonable opportunity to register his claim." *Notes of Committee on the Judiciary, House Report No. 94–1476.* Congress did not, however, apparently envision the even more unusual situation where *an author, who is about to publish and register,* has had a draft wrongfully copied. I believe the statute's denial of the remedy of fees to an author or his assigns in such a situation was an oversight in view of the legislative purpose underlying § 412. However, the statute is unambiguous and consideration of an award of attorney's fees in this situation is foreclosed.

Given the foregoing, I conclude that The Nation has infringed the plaintiffs' copyright without justification. The plaintiffs are awarded the $12,500 they were damaged by Time's non-performance, and such further amounts as may be found to be profits in an accounting before a Magistrate of this Court who shall hear and report thereon. Plaintiffs are awarded costs and disbursements. Attorney's fees are denied. In addition to the foregoing findings of fact and conclusions of law, the plaintiffs' heretofore-submitted detailed findings and conclusions are herewith signed.

So ordered.

Appendix A

## THE FORD MEMOIRS

# BEHIND THE NIXON PARDON

In his memoirs, *A Time to Heal,* which Harper & Row will publish in late May or early June, former President Gerald R. Ford says that the idea of giving a blanket pardon to Richard M. Nixon was raised before Nixon resigned from the Presidency by Gen. Alexander Haig, who was then the White House chief of staff.

Ford also writes that, but for a misunderstanding, he might have selected Ronald Reagan as his 1976 running mate, that

12. *Rokeach v. Avco Embassy Pictures Corp.,* 197 U.S.P.Q. 155 (S.D.N.Y.1978).

13. *Harris v. Miller,* 50 U.S.P.Q. 306 (S.D.N.Y. 1941).

14. Pursuant to the Copyright Act of 1976, 17 U.S.C. § 412, "no award of statutory damages or of attorney's fees, as provided to sections 504 and 505, shall be made for—(1) any infringement of copyright in an unpublished work commenced before the effective date of its registration . . . ."

Plaintiffs have also applied for attorneys' fees on the common law basis set forth in such cases as *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) and *Browning Debenture Holders' Committee v. DASA Corp.,* 560 F.2d 1078 (2d Cir.1977). Although such fees may be awarded in copyright actions where a party has *conducted* litigation in bad faith, this is not such a case.

Washington lawyer Edward Bennett Williams, a Democrat, was his choice for head of the Central Intelligence Agency, that Nixon was the one who first proposed Nelson Rockefeller for Vice President, and that he regretted his "cowardice" in allowing Rockefeller to remove himself from Vice Presidential contention. Ford also describes his often prickly relations with Henry Kissinger.

*The Nation* obtained the 655-page typescript before publication. Advance excerpts from the book will appear in *Time* in mid-April and in *The Reader's Digest* thereafter. Although the initial print order has not been decided, the figure is tentatively set at 50,000; it could change, depending upon the public reaction to the serialization.

Ford's account of the Nixon pardon contains significant new detail on the negotiations and considerations that surrounded it. According to Ford's version, the subject was first broached to him by General Haig on August 1, 1974, a week before Nixon resigned. General Haig revealed that the newly transcribed White House tapes were the equivalent of the "smoking gun" and that Ford should prepare himself to become President.

Ford was deeply hurt by Haig's revelation: "Over the past several months Nixon had repeatedly assured me that he was not involved in Watergate, that the evidence would prove his innocence, that the matter would fade from view." Ford had believed him, but he let Haig explain the President's alternatives.

He could "ride it out" or he could resign, Haig said. He then listed the different ways Nixon might resign and concluded by pointing out that Nixon could agree to leave in return for an agreement that the new President, Ford, would pardon him. Although Ford said it would be improper for him to make any recommendation, he basically agreed with Haig's assessment and adds, "Because of his references to the pardon authority, I did ask Haig about the extent of a President's pardon power."

"It's my understanding from a White House lawyer," Haig replied, "that a President does have authority to grant a pardon even before criminal action has been taken against an individual."

But because Ford had neglected to tell Haig he thought the idea of a resignation conditioned on a pardon was improper, his press aide, Bob Hartmann, suggested that Haig might well have returned to the White House and told President Nixon that he had mentioned the idea and Ford seemed comfortable with it. "Silence implies assent."

Ford then consulted with White House special counsel James St. Clair, who had no advice one way or the other on the matter more than pointing out that he was not the lawyer who had given Haig the opinion on the pardon. Ford also discussed the matter with Jack Marsh, who felt that the mention of a pardon in this context was a "time bomb," and with Bryce Harlow, who had served six Presidents and who agreed that the mere mention of a pardon "could cause a lot of trouble."

As a result of these various conversations, Vice President Ford called Haig and read him a written statement: "I want you to understand that I have no intention of recommending what the President should do about resigning or not resigning and that nothing we talked about yesterday afternoon should be given any consideration in whatever decision the President may wish to make."

Despite what Haig had told him about the "smoking gun" tapes, Ford told a Jackson, Mich., luncheon audience later in the day that the President was not guilty of an impeachable offense. "Had I said otherwise at that moment," he writes, "the whole house of cards might have collapsed."

In justifying the pardon, Ford goes out of his way to assure the reader that "compassion for Nixon as an individual hadn't prompted my decision at all." Rather, he did it because he had "to get the monkey off my back one way or the other."

The precipitating factor in his decision was a series of secret meetings his general counsel, Phil Buchen, held with Watergate

Special Prosecutor Leon Jaworski in the Jefferson Hotel, where they were both staying at the time. Ford attributes Jaworski with providing some "crucial" information—i.e., that Nixon was under investigation in ten separate areas, and that the court process could "take years." Ford cites a memorandum from Jaworski's assistant, Henry S. Ruth Jr., as being especially persuasive. Ruth had written:

"If you decide to recommend indictment I think it is fair and proper to notify Jack Miller and the White House sufficiently in advance so that pardon action could be taken before the indictment." He went on to say: "One can make a strong argument for leniency and if President Ford is so inclined, I think he ought to do it early rather than late."

Ford decided that court proceedings against Nixon might take six years, that Nixon "would not spend time quietly in San Clemente," and "it would be virtually impossible for me to direct public attention on anything else."

Buchen, Haig and Henry Kissinger agreed with him. Hartmann was not so sure.

Buchen wanted to condition the pardon on Nixon agreeing to settle the question of who would retain custody and control over the tapes and Presidential papers that might be relevant to various Watergate proceedings, but Ford was reluctant to do that.

At one point a plan was considered whereby the Presidential materials would be kept in a vault at a Federal facility near San Clemente, but the vault would require two keys to open it. One would be retained by the General Services Administration, the other by Richard Nixon.

The White House did, however, want Nixon to make a full confession on the occasion of his pardon or, at a minimum, express true contrition. Ford tells of the negotiation with Jack Miller, Nixon's lawyer, over the wording of Nixon's statement. But as Ford reports Miller's response, Nixon was not likely to yield. "His few meetings with his client had shown him that the former President's ability to discuss Watergate objectively was almost nonexistent."

The statement they really wanted was never forthcoming. As soon as Ford's emissary arrived in San Clemente, he was confronted with an ultimatum by Ron Zeigler, Nixon's former press secretary. "Let's get one thing straight immediately," Zeigler said. "President Nixon is not issuing any statement whatsoever regarding Watergate, whether Jerry Ford pardons him or not." Zeigler proposed a draft, which was turned down on the ground that "no statement would be better than that." They went through three more drafts before they agreed on the statement Nixon finally made, which stopped far short of a full confession.

When Ford aide Benton Becker tried to explain to Nixon that acceptance of a pardon was an admission of guilt, he felt the President wasn't really listening. Instead, Nixon wanted to talk about the Washington Redskins. And when Becker left, Nixon pressed on him some cuff links and a tiepin "out of my own jewelry box."

Ultimately, Ford sums up the philosophy underlying his decision as one he picked up as a student at Yale Law School many years before. "I learned that public policy often took precedence over a rule of law. Although I respected the tenet that no man should be above the law, public policy demanded that I put Nixon—and Watergate—behind us as quickly as possible."

Later, when Ford learned that Nixon's phlebitis had acted up and his health was seriously impaired, he debated whether to pay the ailing former President a visit. "If I made the trip it would remind everybody of Watergate and the pardon. If I didn't, people would say I lacked compassion." Ford went:

He was stretched out flat on his back. There were tubes in his nose and mouth, and wires led from his arms, chest and legs to machines with orange lights that blinked on and off. His face was ashen, and I thought I had never seen anyone closer to death.

The manuscript made available to *The Nation* includes many references to Henry Kissinger and other personalities who played a major role during the Ford years.

*On Kissinger.* Immediately after being informed by Nixon of his intention to resign, Ford returned to the Executive Office Building and phoned Henry Kissinger to let him know how he felt. "Henry," he said, "I need you. The country needs you. I want you to stay. I'll do everything I can to work with you."

"Sir," Kissinger replied, "it is my job to get along with you and not yours to get along with me."

"We'll get along," Ford said. "I know we'll get along." Referring to Kissinger's joint jobs as Secretary of State and National Security Adviser to the President, Ford said, "I don't want to make any change. I think it's worked out well, so let's keep it that way."

Later Ford did make the change and relieved Kissinger of his responsibilities as National Security Adviser at the same time that he fired James Schlesinger as Secretary of Defense. Shortly thereafter, he reports, Kissinger presented him with a "draft" letter of resignation, which he said Ford could call upon at will if he felt he needed it to quiet dissent from conservatives who objected to Kissinger's role in the firing of Schlesinger.

*On John Connally.* When Ford was informed that Nixon wanted him to replace Agnew, he told the President he had "no ambition to hold office after January 1977." Nixon replied that that was good since his own choice for his running mate in 1976 was John Connally. "He'd be excellent," observed Nixon. Ford says he had "no problem with that."

*On the Decision to Run Again.* Ford was, he tells us, so sincere in his intention not to run again that he thought he would announce it and enhance his credibility in the country and the Congress, as well as keep the promise he had made to his wife, Betty.

Kissinger talked him out of it. "You can't do that. It would be disastrous from a foreign policy point of view. For the next two and a half years foreign governments would know that they were dealing with a lame-duck President. All our initiatives would be dead in the water, and I wouldn't be able to implement your foreign policy. It would probably have the same consequences in dealing with the Congress on domestic issues. You can't reassert the authority of the Presidency if you leave yourself hanging out on a dead limb. You've got to be an affirmative President."

*On David Kennerly, the White House photographer.* Schlesinger was arguing with Kissinger and Ford over the appropriate response to the seizure of the *Mayaguez.* At issue was whether airstrikes against the Cambodians were desirable; Schlesinger was opposed to bombings. Following a lull in the conversation, Ford reports, up spoke the 30-year-old White House photographer, David Kennerly, who had been taking pictures for the last hour.

"Has anyone considered," Kennerly asked, "that this might be the act of a local Cambodian commander who has just taken it into his own hands to stop any ship that comes by?" Nobody, apparently, had considered it, but following several seconds of silence, Ford tells us, the view carried the day. "Massive airstrikes would constitute overkill," Ford decided. "It would be far better to have Navy jets from the *Coral Sea* make surgical strikes against specific targets."

*On Nixon's Character.* Nixon's flaw, according to Ford, was "pride." "A terribly proud man," writes Ford, "he detested weakness in other people. I'd often heard him speak disparagingly of those whom he felt to be soft and expedient. (Curiously, he didn't feel that the press was weak. Reporters, he sensed, were his adversaries. He knew they didn't like him, and he responded with reciprocal disdain.)"

Nixon felt disdain for the Democratic leadership of the House, whom he also regarded as weak. According to Ford, "His pride and personal contempt for weakness

had overcome his ability to tell the difference between right and wrong," all of which leads Ford to wonder whether Nixon had known in advance about Watergate.

On hearing Nixon's resignation speech, which Ford felt lacked an adequate plea for forgiveness, he was persuaded that "Nixon was out of touch with reality."

. . . . .

In February of last year, when *The Washington Post* obtained and printed advance excerpts from H.R. Haldeman's memoir, *The Ends of Power,* on the eve of its publication by Times Books, *The New York Times* called *The Post*'s feat "a second-rate burglary."

*The Post* disagreed, claiming that its coup represented "first-rate enterprise" and arguing that it had burglarized nothing, that publication of the Haldeman memoir came under the Fair Comment doctrine long recognized by the courts, and that "There is a fundamental journalistic principle here—a First Amendment principle that was central to the Pentagon Papers case."

In the issue of *The Nation* dated May 5, 1979, our special Spring Books number, we will discuss some of the ethical problems raised by the issue of disclosure.