**Frank FOURNIER, Plaintiff,**

v.

**McCann ERICKSON and Microsoft Corporation, Defendants.**

**No. 00 Civ. 8636(VM).**

United States District Court, S.D. New York.

Jan. 21, 2003.

---

Stephen A. Weingrad, Weingrad & Weingrad, L.L.P., New York City, for Plaintiff.

Richard Dannay, Cowan Liebowitz & Latman, P.C., New York City, for Defendants.

### DECISION AND ORDER

MARRERO, District Judge.

Plaintiff Frank Fournier ("Fournier") commenced this action on November 13, 2000, alleging copyright infringement and related state law claims against defendants McCann Erickson ("McCann") and Microsoft Corporation ("Microsoft," and collectively with McCann, "Defendants"). The matter is scheduled for trial before this Court on February 10, 2003. The Court here addresses issues raised in three separate motions *in limine,* two filed by Fournier on September 30, 2002 and October 29, 2002 and one filed by Defendants on October 4, 2002. For the reasons stated below, each motion is GRANTED IN PART and DENIED IN PART.

### I. BACKGROUND

A factual recitation of the underlying controversy is presented in the Court's Decision and Order dated May 29, 2002 addressing Defendants' motion for summary judgment, familiarity with which is presumed.[1]

---

1. The May 29, 2002 Decision and Order is reported as *Fournier v. McCann Erickson,* 202

The parties' motions *in limine* raise numerous issues, many of which overlap. Because of this overlap, the Court will organize its discussion so as to address the arguments pertaining to each issue holistically rather than in a compartmentalized manner tracking the parties' separate briefing of the three motions.

### II. DISCUSSION

### A. ASSORTED DOCUMENTS

Fournier seeks rulings on the admissibility of various documents produced to him during discovery. Defendants object on various grounds. The Court addresses each document in turn.

#### 1. *Plaintiff's Exhibit 3*

Plaintiff's Exhibit 3, an Assignment Delivery Memo dated September 21, 1999 (the "Assignment Delivery Memo") represents a layered hearsay issue. The Court concludes that, based on representations by Fournier that Patricia Watson's ("Watson") testimony will establish that this document is prepared in the ordinary course of business, the Assignment Delivery Memo itself would fall under the business records exception to the hearsay rule embodied in Rule 803(6) of the Federal Rules of Evidence. Because Defendants do not object to the underlying document, (Defendants' Memorandum Of Law In Opposition to Plaintiff's Motion *In Limine* dated November 1, 2002, at 13), the Court will rely on these representations by Fournier for purposes of this motion. The notation, "9/22/99 Client *loves* imagery per Philip Pavliger," which Defendants challenge as hearsay, constitutes a present sense impression by Watson, recorded during or just after a telephone conversation be-

F.Supp.2d 290 (S.D.N.Y.2002).

tween Watson and Philip Pavliger, and accordingly falls within the exception to the hearsay rule provided by Rule 803(1). (Deposition of Patricia White Watson dated May 25, 2001 ("Watson Dep."), at 102–104.) Further, the content of the notation is an admission by a party-opponent under Rule 801(D)(2)(a) and (c). In addition, the Assignment Delivery Memo is relevant to the issue of Defendants' access to Fournier's work and to the states of mind of their principals in regards to it. Accordingly, Defendants' objections to Plaintiff's Exhibit 3 are overruled.

### 2. *Plaintiff's Exhibit 5*

Plaintiff's Exhibit 5, a document entitled Quotation Stock Photography dated September 27, 1999 is admissible under the same rationale as regards the Assignment Delivery Memo. As before, because Defendants do not object to the underlying document, the Court accepts Fournier's representations concerning its foundation and concludes that this document constitutes a business record under Rule 803(6). The document is relevant to the issue of access. Fournier states that he does not seek to introduce the notation, "300K Media Buy per Philip," which the Defendants challenge as hearsay, to prove the truth of the matter asserted, namely, the monetary size of the given media purchase, but, rather, as evidence that the parties were continuing to negotiate a fee for Fournier's work. For these reasons, Defendants' objections to Plaintiff's Exhibit 5 are overruled.

### 3. *Plaintiff's Exhibit 7*

Plaintiff's Exhibit 7, a Print Order dated September 29, 1999 (the "Print Order"), again, assuming a proper foundation as represented by Fournier which the Court accepts for present purposes for the reasons stated above, falls under the business records exception to the hearsay rule. The Print Order is relevant to access and, insofar as it identifies certain prints, similarity. The notation, "9/30/99 Cancelled—Client changed concept. Send invoice. Philip," which Defendants challenge as hearsay, is admissible as a statement by a party-opponent under Rule 801(D)(2)(a) and (c). Accordingly, Defendants' objections to the Print Order are overruled.

### 4. *Plaintiff's Exhibit 3A*

Defendants object to the handwritten notations on these contact sheets identifying certain photographs as "Print for main photo or extra guy," "Print for main photo," and "Print for extra guy." These notations are not hearsay because they are not offered for the truth of the matter asserted as none of the photographs identified were actually used in Defendants' advertisements. Even if the notations were offered for this purpose, they were made while the contact sheets were in the possession of defendant McCann and, accordingly, represent admissions by a party-opponent under Rule 801(D)(2)(a) and (c) and Rule 807. The contact sheets are relevant to access and similarity insofar as they depict what photographs were supplied to Defendants, and the notations are relevant to state of mind insofar as they reflect the impressions of McCann, and perhaps Microsoft, officials regarding certain of these photographs. For these reasons, Defendants' objections to the contact sheets comprising Plaintiffs' Exhibit 3A are overruled.

### 5. *Plaintiff's Exhibit 18*

■ Fournier wishes to introduce six photographs in enlarged form that appear among others in the report of Defendants' expert, Mona Yuter. Fournier intends to offer these photographs as examples of alternative expressions of the same idea as that embodied in his work. This distinction between expression and ideas is rele-

vant to the scope of protection offered to him by copyright law. Because Defendants themselves intend to use these six photographs, the core of their objection to Fournier's using them concerns their enlargement. Because the photographs have not been altered or distorted but simply enlarged to facilitate their public viewing, and because the originals will be available to the jury as well, admitting these photographs in enlarged form is consistent with the import of Rule 1006 addressing charts and summaries. For these reasons, Defendants' objections to Plaintiff's Exhibit 18 are overruled.

### 6. *Plaintiff's Exhibit 18A*

This photograph, one of Fournier's works entitled "Foofi in Sun City," was published previously and is offered for the purpose of demonstrating Fournier's credentials as a professional photographer. Fournier's status as a professional photographer is not in dispute, however, and, accordingly, this photograph is not relevant under Rule 401 on this basis. For this reason, Plaintiff's Exhibit 18A is inadmissible to establish Fournier's credentials.

### 7. *Plaintiff's Exhibit 19*

These photographs are enlarged versions of three contained in the contact sheets comprising Plaintiff's Exhibit 3A and identified by the notations, "Print for main photo or extra guy," "Print for main photo," and "Print for extra guy." Because the photographs in original size will be available to the jury, because there is no evidence of distortion or alteration other than enlargement, and because the enlargement of these three photographs will facilitate public viewing, these enlargements are consistent with the import of Rule 1006. Accordingly, Plaintiff's Exhibit 19 is admissible. No benefit is derived from enlarging the notations appearing in the margins of the contact sheets from

which these three photographs have been taken and enlarged, and, therefore, these notations must be redacted.

The Court notes an apparent inconsistency concerning Plaintiff's Exhibit 19. In his submission to the Court entitled Plaintiff's Exhibits In Support of Motion *In Limine,* Volume 1, Fournier identifies this exhibit as consisting of the three photographs discussed above. In the Joint Pretrial Order dated August 21, 2002 (the "Joint Pretrial Order"), however, Fournier describes this exhibit as an apparent compilation of two photographs, stating "Plaintiff's photograph selected by defendant for digital transmission to McCann and defendants' infringing photograph." (Joint Pretrial Order at 15.) Because Fournier has not submitted a copy of this form of the exhibit to the Court, the Court will reserve judgment to the extent Plaintiff's Exhibit 19 is to be so comprised and will infer, for now, that the exhibit is intended to be comprised of the three photographs addressed in the preceding paragraph. The Court directs Fournier to clarify the composition of the exhibit he intends to identify as Plaintiff's Exhibit 19 both to Defendants and the Court within three days of this Order. If the intended composition is not the three photographs addressed above but, rather, the two photograph compilation described in the Joint Pretrial Order, Fournier is further directed to submit a color copy of that item or items so that the Court can rule on Defendants' objections.

### B. *EVIDENCE RELATING TO DAMAGES*

Fournier seeks to establish damages by presenting evidence as to "1) gross revenues from Windows 2000 with regard to defendant MICROSOFT and 2) evidence as to the advertising campaign revenues defendant McCANN received in connec-

tion with the Windows 2000 advertising campaign it was hired to produce." (Plaintiff's Memorandum Of Law In Opposition To Defendants' Motion *In Limine* dated October 19, 2002, at 4.) Fournier identifies the following exhibits he intends to offer as circumstantial evidence of Defendants' profits: Plaintiff's Exhibits 19A, 20, 20A, 21–30, 32–37, 38A, and 40–43. Defendants object to the introduction of this evidence, claiming that it bears no reasonable relationship to the alleged infringement and that it is unfairly prejudicial. They claim that evidence of overall profits from Windows 2000 sales is overbroad and speculative insofar as the advertising campaign prompting these sales encompassed much more than Defendants' alleged infringing use of Fournier's photograph. Similarly, Defendants object to evidence reflecting McCann's total payment for its Windows 2000 marketing services because these services encompassed much more than supplying the allegedly infringing advertisement.

■ The Copyright Act of 1976 (the "Copyright Act"), 17 U.S.C. § 101 *et seq.*, allows a copyright owner whose rights have been infringed to recover "the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). "[T]he Act provided for *damages* to compensate the copyright holder for losses suffered as a result of the infringement and also allowed for the award of *profits* of the infringer to prevent the infringer from unfairly benefitting from its wrongful act." *Fitzgerald Publ'g Co., Inc. v. Baylor Publ'g Co., Inc.,* 807 F.2d 1110, 1118 (2nd Cir.1986) (emphasis in original). To establish profits, the copyright owner is required to "present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements

of profit attributable to factors other than the copyrighted work." *Id.* The Second Circuit has explained that "gross revenue" as used in this section means "gross revenue reasonably related to the infringement, not unrelated revenues." *Davis v. The Gap, Inc.,* 246 F.3d 152, 160 (2nd Cir.2001). It is undisputed that the exhibits at issue, identified above, exceed the scope of recovery to which Fournier would be entitled should he establish infringement. The issue for the Court to decide is whether the documents are so overbroad that they do not bear a reasonable relationship to the infringement.

The reasonableness of the relationship of Fournier's proposed evidence to the infringement is best addressed in two stages. The first concerns the scope of permissible evidence of profits, and the second concerns the allowable methods of establishing such profits. The Court begins with the scope issue.

In *Davis,* the defendant, The Gap, Inc. (the "Gap"), used for print advertisement purposes a photograph in which one of the models prominently displayed a distinctive eyeglass design owned by the plaintiff, On Davis ("Davis"). As evidence of the Gap's profits, Davis submitted evidence of an increase of $146 million in net sales realized by the Gap's corporate parent following the Gap's use of that print ad, as compared to the corresponding period during the previous year. The Second Circuit concluded that this evidence was not reasonably related to the precise infringement at issue, explaining that "[b]ecause the ad infringed only with respect to Gap label stores and eyewear, ... it was incumbent on Davis to submit evidence at least limited to the gross revenues of the Gap label stores, and perhaps also limited to eyewear or accessories." *Davis,* 246 F.3d at 159–160.

In further explanation of what constitutes "gross revenue reasonably related to the infringement," the Second Circuit offered the following illustration:

[I]f a publisher published an anthology of poetry which contained a poem covered by the plaintiff's copyright, we do not think the plaintiff's statutory burden would be discharged by submitting the publisher's gross revenue resulting from its publication of hundreds of titles, including trade books, textbooks, cookbooks, etc. In our view, the owner's burden would require evidence of the revenues realized from the sale of the anthology containing the infringing poem. The publisher would then bear the burden of proving its costs attributable to the anthology and the extent to which its profits from the sale of the anthology were attributable to factors other than the infringing poem, including particularly the other poems contained in the volume.

*Id.* at 160. This illustration and the Circuit Court's holding illustrate a core concern, namely, that "the statutory term, 'infringer's gross revenue' should not be construed so broadly as to include revenue from lines of business that were unrelated to the act of infringement." *Id.*

■ By the same token, the Second Circuit recognizes that the evidence of profits offered by a copyright owner need not, and often cannot, be directly tied solely to the infringement. The Circuit Court's opinion in *Orgel v. Clark Boardman Co.*, 301 F.2d 119 (2nd Cir.1962) illustrates this point. Once a copyright owner has presented evidence of profits reasonably related to the infringement, the Copyright Act shifts the burden to the infringer to establish "the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b); *Davis,* 246 F.3d at 160. The Second Circuit in *Orgel* explained, however, that "[i]n cases … where an infringer's profits are not entirely due to the infringement, and the evidence suggests some division which may rationally be used as a springboard it is the duty of the [trier-of-fact] to make some apportionment." *Orgel,* 301 F.2d at 121; *see also Cream Records, Inc. v. Jos. Schlitz Brewing Co.,* 754 F.2d 826, 828–29 (9th Cir. 1985). In providing for such apportionment, the Second Circuit necessarily recognizes that evidence of damages offered by a copyright owner to establish his initial burden need not reflect profits derived solely and directly from the infringing activity.

■ In the present case, *Davis* and *Orgel* counsel the Court to conclude that Fournier may offer evidence of Microsoft's sales or profits from its overall sales of its Windows 2000 product line—but not from any of its other products or services—for the relevant time period. The burden will then shift to Microsoft to establish what portion of these overall sales were attributable to factors other than its alleged infringement. The same principles apply to McCann's profits. *See, e.g., Cream Records, Inc. v. Joseph Schlitz Brewing Co.,* 864 F.2d 668, 669 (9th Cir.1989) (copyright owner met initial burden of establishing profits resulting from advertising agent's infringement by introducing evidence of how much it was paid for the infringing commercial). Accordingly, Fournier is entitled to present evidence as to McCann's overall profits from supplying Microsoft advertising and marketing services relating to its Windows 2000 product line, but not from any other contracts or sources of revenue. The burden will then shift to McCann to establish what portion of these profits is attributable to factors other than the alleged infringement.

■ Turning to the question of methods of proof, the Court notes that during discovery Defendants did not supply direct

evidence of Microsoft's sales or net profits from its sales of Windows 2000. (Plaintiff's Memorandum Of Law In Opposition To Defendants' Motion *In Limine* dated October 19, 2002, at 7.) In *Deering Milliken & Co. v. Gilbert,* 269 F.2d 191, 193 (2nd Cir.1959), the Second Circuit explained that the defendant's

> failure and refusal to produce the most satisfactory evidence of sales—or absence of sales—leaves his cause exposed to indirect and less definite and certain methods of proof.... And where, as here, the defendant controls the most satisfactory evidence of sales the plaintiff needs only establish a basis for a reasoned conclusion as to the extent of injury caused by the deliberate and wrongful infringement.

*Id.* (citations omitted); *see Louis Vuitton S.A. v. Spencer Handbags Corp.,* 765 F.2d 966, 973 (2nd Cir.1985) ("Where the defendants fails [sic] to produce evidence to refute plaintiffs' evidence of defendants' sales of counterfeit products, the court must rely on less certain methods of proof."). Accordingly, it is clear that "when the defendant fails to provide satisfactory evidence of its actual sales, the court may rely on indirect or circumstantial evidence.... The plaintiff need only establish a basis for a reasoned conclusion; the court may then extrapolate from the available evidence to determine the amount of the recovery." *Aris Isotoner, Inc. v. Dong Jin Trading Co., Inc.,* No. 87 Civ. 8904, 1989 WL 236526, at *6 (S.D.N.Y. Sept. 22, 1989).

For the reasons discussed above, the Court concludes that the portion of Defendants' motion seeking a "general ruling barring Plaintiff from recovery of Defendants' profits and precluding him from introducing the type of projected or actual revenues, expenditures and fees that he intends to rely on," (Defendants' Memorandum of Law In Support Of Motion *In Limine* To Preclude Recovery Of Defen-

dants' Profits And For Other Relief dated October 4, 2002, at 4), must be denied.

Regarding the portion of Fournier's motion seeking rulings on the admissibility of specific exhibits concerning Defendants' sales or profits, the Court concludes as follows:

### 1. *Plaintiff's Exhibit 19A*

■ These documents, Microsoft Bates Stamp 1415–1429, record general plans concerning Microsoft's presence and efforts to market the launch and sale of Windows 2000 at certain trade shows and exhibitions. They contain few specific details and no specific references to numbers of vendors, numbers of buyers, sales figures, pricing information, etc. The Court concludes that these documents are not relevant to Microsoft's sales of, or net profits from, Windows 2000 because any inferences regarding sales or profits from such general marketing plans would be too speculative to merit any probative weight. Furthermore, any portions exhibiting some arguable minimal probative value would be outweighed by the otherwise clearly irrelevant content that risks a waste of time and jury distraction in light of the fact that any probative information contained in these documents can easily be presented through witness testimony. For these reasons, Defendants' objections under Rules 401 and 403 to Plaintiff's Exhibit 19A are sustained.

### 2. *Plaintiff's Exhibit 20*

■ This document, Microsoft Bates Stamp 123, is a computer printout of the fees Microsoft paid for various print publications to run the allegedly infringing advertisement. Fournier claims that this information is relevant because it would allow a jury to infer profits based on the advertising costs expended by Microsoft, specifically, that the profits must be at

least equal to the costs or Microsoft would not have incurred such costs in the first place. The Court finds that evidence of advertising costs does not support any inference concerning Microsoft's profits that can reasonably be understood to be non-speculative. Accordingly, Defendants' objections to this exhibit under Rule 401 are sustained.

### 3. *Plaintiff's Exhibit 20A*

■ These documents, Microsoft Bates Stamp 1430–1438, explain in general terms marketing strategies for Windows 2000 to be conducted in phases before, during, and after the launch of the product. Fournier identifies this exhibit as one of several "evidencing the enormous advertising campaign set up by defendants in order to launch Windows 2000." (Reply Memorandum Of Law In Support Of Plaintiff's Motion *In Limine* dated November 15, 2002, at 4.) While Fournier attributes the same relevance to Plaintiff's Exhibit 19A, that exhibit addresses more isolated periods and events in this overall marketing plan. Plaintiff's Exhibit 20A addresses the general phases and is accordingly less likely to distract the jury's attention and waste time while simultaneously presenting a better understanding of the overall marketing efforts within which the allegedly infringing advertisement was situated. Also, the Court recognizes no unfair prejudice to Defendants that would result from the introduction of these documents. For these reasons, the Court finds this exhibit relevant to Defendants' use of the allegedly infringing photograph and more probative than prejudicial. Accordingly, Defendants' objections to this exhibit under Rules 401 and 403 are overruled. The Court notes that this exhibit is not relevant to the question of Microsoft's profits, however, because, as stated in the Court's discussion of Plaintiff's Exhibit 19A, evidence of general marketing breadth and strategy is too speculative to support inferences regarding Microsoft's sales of or profits from Windows 2000.

### 4. *Plaintiff's Exhibit 21*

■ These documents, Microsoft Bates Stamp 1439–1454, address two major themes: Microsoft's relationship with its advertising agency; and the internal consistency of the advertising strategy, that is, the similarities and differences among advertisements in the various media formats employed, including print, which is the medium by which the alleged infringement was disseminated. The latter content is relevant to the concept of idea versus expression, a core consideration for purposes of copyright protection. It is also relevant to the extent that it will assist the jury to understand the overall nature of Defendants' marketing campaign and, more specifically, the role and relative importance of the allegedly infringing photograph within it. Any risk of jury distraction or waste of time posed by the former content, namely, Microsoft's working relationship with its advertising agency, is outweighed by these benefits. The Court finds no basis to conclude that these documents would unfairly prejudice Defendants. Accordingly, Defendants' objections to this exhibit under Rules 401 and 403 are overruled.

### 5. *Plaintiff's Exhibit 22*

This document, Microsoft Bates Stamp 1455–1456, lists a chronology of advertisements promoting Windows 2000. It offers the same benefits as Plaintiff's Exhibits 20A and 21, and for the same reasons, Defendants' objections are overruled.

### 6. *Plaintiff's Exhibit 23*

■ This strategy memorandum entitled "Windows 2000 IEU Creative Brief" addresses targeted sales figures and marketing strategies. The sales goals are rel-

evant as circumstantial evidence of profits and outweigh any potential for jury distraction, waste of time, or prejudice to Microsoft posed by the marketing strategy content. For these reasons, Defendants' objections under Rules 401 and 403 are overruled.

### 7. *Plaintiff's Exhibit 24*

■ This business strategy memorandum entitled "Microsoft Windows 2000 Launch Campaign Input Document: Version 4″ addresses Microsoft's targeted increase in overall market share and operating system licenses as a result of Windows 2000 sales." These figures reflect not only general sales goals, as opposed to actual sales figures, but they were also made in advance of the Windows 2000 release. For these reasons, the Court concludes that the figures presented are highly speculative bases from which to infer actual sales or profits. While the degree of speculation is not so great as to render this content irrelevant, it does severely limit its probative value. Furthermore, the size of the figures contained in these discussions, including references to market share growth of 30 to 50 percent, tens of millions of new licensees, and revenue growth in the billions of dollars, are likely to significantly prejudice the jury despite the Defendants' burden of establishing what portion of the overall gross revenues are actually attributable to factors other than the alleged infringement, *see* 17 U.S.C. § 504(b); *Davis*, 246 F.3d at 160.

For these reasons, Defendants' objections to Plaintiff's Exhibit 24 under Rule 401 are overruled, but those under Rule 403 are sustained.

### 8. *Plaintiff's Exhibits 25 and 26*

■ The majority of Plaintiff's Exhibit 25, a marketing memorandum entitled "Microsoft Windows 2000 Launch Campaign Brief," addresses efforts to identify Windows 2000 as an operating system particularly suited for business. This issue is not relevant to the question of damages as any inference based simply on Microsoft's targeting of the business community as buyers would be speculative and untenable. The memorandum also includes some discussion of marketing phases that would be beneficial for the reasons stated in the Court's discussion of Plaintiff's Exhibit 20A. Any such benefit is cumulative in light of the admissibility of Plaintiff's Exhibit 20A, and, unlike Plaintiff's Exhibit 20A, the majority of this memorandum addresses irrelevant issues that present a potential to waste time, distract the jury, and needlessly prejudice Defendants. For these reasons, Defendants' objections to Plaintiff's Exhibit 25 under Rules 401 and 403 are sustained.

Furthermore, Plaintiff's Exhibit 26, Microsoft Bates Stamp 1470–1515, addresses largely the same issues as Plaintiff's Exhibit 25, and for the reasons discussed with respect to that exhibit, Defendants' objections to Plaintiff's Exhibit 26 under Rules 401 and 403 are sustained.

### 9. *Plaintiff's Exhibit 27*

■ These documents, Microsoft Bates Stamp 1516–1537, principally address details and logistics concerning Microsoft's presentation of Windows 2000 at one particular industry convention, including logistical details such as booth sizes and locations, exhibits, demonstration stations, giveaways, etc. As indicated in the Court's discussions of Plaintiff's Exhibits 19A and 25, any inferences about Microsoft's profits or sales derived from evidence of its marketing focus would be too speculative and untenable, especially when that evidence is so particular in focusing on the details of a single industry event. A few references to budgetary allocations appear in this material, but, for the rea-

sons stated in the Court's discussion of Plaintiff's Exhibit 20, advertising expenses cannot reasonably support inferences regarding Microsoft's sales or profits and are, therefore, not relevant. For these reasons, Defendants' objections to this exhibit under Rules 401 and 403 are sustained.

### 10. *Plaintiff's Exhibit 28*

■ The documents contained in this exhibit, Microsoft Bates Stamp 1538–1541, reflect budgetary proposals and allocations for the Windows 2000 advertising campaign. For the reasons indicated in the Court's discussion of Plaintiff's Exhibit 20, the size of the Defendants' advertising budget cannot support a reasonable inference regarding Microsoft's sales or profits. Therefore, Defendants' objections to Plaintiff's Exhibit 28 under Rule 401 are sustained.

### 11. *Plaintiff's Exhibit 29*

■ These documents, Microsoft Bates Stamp 1542–1596, once again, represent marketing strategies and plans for Windows 2000 targeting information technology professionals. As previously indicated, inferences about Microsoft's profits or sales derived from evidence of its marketing focus would be too speculative to permit. For this reason, Defendants' objections to Plaintiff's Exhibit 29 under Rule 401 are sustained.

### 12. *Plaintiff's Exhibits 30 and 40*

■ This exhibit, entitled "Advertising Agreement Between Microsoft Corporation and McCann USA, Inc.," represents the advertising agreement between Microsoft and McCann. It is relevant to Fournier's alleged damages insofar as it indicates McCann's fees charged to Microsoft for its services regarding the Windows 2000 advertising and marketing campaign, thus representing McCann's gross revenues from this work.[2] To the extent that this document presents compensation figures for services concerning matters unrelated to the Windows 2000 advertising and marketing campaign, such figures must be redacted in light of the holdings by the Second Circuit in *Davis* and *Orgel,* which require a reasonable relationship to the infringement.

Defendant's object under Rule 403, asserting that learning of these figures will prejudice the jury into viewing McCann, and even Microsoft, as a "deep pocket." The Court concludes that any such prejudice would not be "unfair" because it begs the very question Fournier is required by the Copyright Act to raise, namely, the extent of McCann's profits or sales attributable to the alleged infringement. As explained in detail above, the Copyright Act places the initial burden on Fournier to establish damages and requires him to "present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b).

Defendants also object to this exhibit on the ground that these compensation figures reflect McCann's fee for all of its services related to the Windows 2000 campaign, not just those surrounding the allegedly infringing photograph. This argument lacks merit, however, because the Copyright Act places the burden of showing what portions of this overall figure are attributable to factors other than the alleged infringement on Defendants. *See* 17 U.S.C. § 504(b); *Davis,* 246 F.3d at 160.

---

**2.** The document also addresses copyright ownership of creative works produced in the course of McCann's rendering of services to Microsoft under their agreement, and may be relevant to issues disputed at trial on this basis.

The trier of fact will then determine the appropriate apportionment. *See Orgel,* 301 F.2d at 121; *Cream Records, Inc.,* 754 F.2d at 828–29.

Finally, defendants also assert that they would be unfairly prejudiced by the disclosure of these figures because they represent confidential business information. The Court concludes that the probative value the information represents regarding the issue of damages outweighs any such prejudice and therefore rejects Defendants' challenge to Plaintiff's Exhibit 30 under Rule 403.

For the reasons discussed above, Defendants' objections to Plaintiff's Exhibit 30 are overruled. Furthermore, Plaintiff's Exhibit 40 represents the same document as Plaintiff's Exhibit 30, the Windows 2000 advertising and marketing agreement between McCann and Microsoft. Plaintiff's Exhibit 30 was produced during discovery by Microsoft, and Plaintiff's Exhibit 40 was produced by McCann. Because these two exhibits represent the same document, the Court's conclusions regarding Plaintiff's Exhibit 30 apply to Plaintiff's Exhibit 40 as well.

### 13. *Plaintiff's Exhibits 32 and 43*

This set of documents, McCann Bates Stamp 1–55, represents Defendants' plan to communicate the benefits of Windows 2000 to buyers, identifying timetables, selling points, target audiences, costs, etc. The material is not relevant to damages as neither the overall marketing strategy nor the costs incurred can support any reasonable inference regarding sales or profits. While this set of documents includes one vague reference to the business goal being "40% Growth = $4.9 Billion," this reference is more prejudicial than probative for the reasons explained in the Court's discussion of Plaintiff's Exhibit 24. Therefore, Defendants' objections to Plaintiff's Exhibit 32 under Rule 403 are sustained as well.

Furthermore, Plaintiff's Exhibit 43, McCann Bates Stamp 1057–1094, represents an earlier version of the set of documents comprising Plaintiff's Exhibit 32. Because the substance of both sets of documents is essentially the same, the Court's conclusions regarding Plaintiff's Exhibit 32 also apply to Plaintiff's Exhibit 43. Therefore, Defendant's objections to Plaintiff's Exhibit 43 under Rules 401 and 403 are also sustained.

### 14. *Plaintiff's Exhibits 33 and 36*

This document, McCann Bates Stamp 56–64, is a composite of earlier versions of the two documents comprising Plaintiff's Exhibits 24 and 25. Furthermore, Plaintiff's Exhibit 36, McCann Bates Stamp 74–82, is the same as that comprising Plaintiff's Exhibit 33, with the only difference being a single additional page summarizing certain marketing information regarding the Windows 2000 campaign. The overall content of these three documents is the same. Accordingly, for the reasons expressed in the Court's discussions of Plaintiff's Exhibits 24 and 25, Defendants' objections to Plaintiff's Exhibits 33 and 36 under Rules 401 and 403 are sustained.

### 15. *Plaintiff's Exhibit 34*

This memorandum, entitled "Windows 2000 Campaign Brief, Revision 1: 8/17/99," summarizes aspects of the Windows 2000 advertising and marketing campaign, including timelines, product strengths, and selling points. As previously indicated, such overall marketing strategy cannot support any reasonable inference pertaining to damages and, accordingly, Defendants' objections to this exhibit under Rule 401 are sustained.

**16.** *Plaintiff's Exhibit 35*

This document, entitled "Microsoft Windows 2000 Define & Clarify Creative Input Document, Version 1," summarizes the marketing strategy for Windows 2000, including communications objectives and a statement of the target audience. It offers no reasonable basis to infer an appropriate measure of damages and, accordingly, Defendants' objections under Rule 401 are sustained.

**17.** *Plaintiff's Exhibit 37*

These documents, McCann Bates Stamp 83–123, represent another presentation of the overall marketing strategy for Windows 2000, in particular, how to clarify certain points of confusion in the public perception of the product, and, once again, this information cannot support a reasonable inference regarding damages. Plaintiff's Exhibit 37 also includes a listing of advertisement spots, the very same listing that comprises Plaintiff's Exhibit 20. Therefore, the Court's conclusions with respect to Plaintiff's Exhibit 20 apply to this portion of Plaintiff's Exhibit 37. For all of these reasons, Defendants' objections to Plaintiff's Exhibit 37 under Rule 401 are sustained.

**18.** *Plaintiff's Exhibit 38A*

This document is entitled "Revised Product Estimate" and contains an itemization of certain expenses related to the Windows 2000 media campaign. For the reasons expressed in the Court's discussion of Plaintiff's Exhibit 20, Defendants' objections to this document under Rule 401 are sustained.

**19.** *Plaintiff's Exhibit 39*

Defendants object to the characterization of these proposed advertisement layouts, McCann Bates Stamp 130–138, as Defendants' advertisements. Fournier represents that he does not intend to char-

acterize these proposals as such but, rather, to offer them as evidence of access and similarity and of collaboration between the two defendants insofar as these proposals were presented to Microsoft by McCann and contain the allegedly infringing photograph. In light of this representation, the Court need not address this exhibit further.

**20.** *Plaintiff's Exhibit 41*

This document is entitled "Microsoft Consulting Services Master Service Agreement." It represents several compartmentalized work agreements between McCann and an apparent subdivision of Microsoft that provides consulting services. Because McCann is receiving and paying for these services rather than providing them, this document is not indicative of McCann's gross revenues reasonably related to the use of the allegedly infringing photograph. Accordingly, the Court concludes that Defendants' objections under Rule 401 to the admissibility of this exhibit on this basis are sustained.

**21.** *Plaintiff's Exhibit 42*

These documents, Microsoft Bates Stamp 1011–1056, include a budget allocation for the Windows 2000 advertising and marketing campaign as well as an overview of Defendants' contemplated selling strategy for the product line. As indicated, neither marketing strategy nor the costs incurred constitute a basis for any reasonable inference regarding damages. Accordingly, Defendants' objections to Plaintiff's Exhibit 42 under Rule 401 are sustained.

**C.** *REQUEST FOR ADMISSIONS*

Fournier seeks an order compelling Defendants to respond to his Request For Admissions dated September 20, 2002 (the "RFA"). Defendants oppose, arguing that

the RFA was not timely made. The Court agrees with Defendants.

■■■■■ Fact discovery in this case concluded on July 20, 2001. Expert discovery concluded on September 14, 2001. Fournier's RFA was made over a year later, and Defendants refused to respond on grounds of untimeliness. Requests for admissions pursuant to Rule 36 of the Federal Rules of Civil Procedure are generally bound by fact discovery deadlines. *See Cespedes v. Coughlin,* 179 F.R.D. 122, 125–26 (S.D.N.Y.1998); *Siao–Pao v. George,* No. 90 Civ. 5376, 1992 WL 236184, at *3 (S.D.N.Y. Sept. 10, 1992). While the Court has discretion to compel a response to untimely requests for admissions, *see, e.g., Revlon Consumer Corp. v. Estee Lauder Co., Inc.,* No. 00 Civ. 5960, 2001 WL 521832, at *1 (S.D.N.Y. May 18, 2001), the Court has been presented with no compelling reason to do so, especially where, as here, the request is made more than one year after the discovery deadline and on the eve of trial. For these reasons, that portion of Fournier's motion seeking to compel Defendants to respond to the RFA is denied.

### D. *COPYRIGHT REGISTRATION CERTIFICATE*

In his Notice Of Motion dated September 30, 2002, Fournier moves the Court to modify the Joint Pretrial Order and admit into evidence Copyright Registration Certificate No. VAU–489–018 issued to Fournier by the United States Copyright Office. This registration pertains to certain photographs taken by Fournier, including the work he alleges was infringed by Defendants. Defendants stipulate to the admission of this document as Plaintiff's Exhibit 45, to the extent that it is construed as the two-page certificate, (Defendants' Declaration In Opposition To Plaintiff's Motion *In Limine* dated October 21, 2002, ¶¶ 9–13, Ex. P–S), and object to including as a part of this exhibit contact sheets which, according to Defendants, do not constitute part of the registration certificate that was issued. Fournier does not address the issue in his supporting memoranda, nor does his Notice Of Motion clarify whether he requests the introduction of the contact sheets as part of the exhibit. Because he does not address the point, the Court will permit the introduction of the registration certification without any contact sheets, noting that these same sheets, according to Defendants, constitute Plaintiff's Exhibit 3A, which the Court addresses independently in Section II.A.4 *infra.*

### E. *FAIR USE DEFENSE*

■■■■ Fournier's September 30, 2002 motion *in limine* also seeks to dismiss Defendants' affirmative defense of fair use. He argues that the undisputed facts of the case compel the conclusion that, as a matter of law, Defendants cannot satisfy the statutory criteria for this defense. Defendants argue that moving to dismiss a claim, without reference to evidence contemplated for introduction at trial, is not a proper subject of a motion *in limine* and that even if it were, the issue of fair use is a jury question.

Defendants are correct in their assertion that dismissing claims is not the prototypical purpose of a motion *in limine.* This Court has previously explained that "[t]he purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence." *United States v. Paredes,* 176 F.Supp.2d 192, 193 (S.D.N.Y. 2001) (citation omitted). The United States Supreme Court has explained that "the practice [of reviewing evidence *in limine* ] has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States,* 469 U.S. 38, 41 n. 4, 105 S.Ct. 460,

83 L.Ed.2d 443 (1984). District courts' responses to efforts to dismiss claims through motions *in limine* have been mixed. Sometimes, the motions have been addressed on the merits. *See, e.g., Pepe v. Maklansky,* 67 F.Supp.2d 186, 187 (S.D.N.Y.1999); *Wright v. Kelly,* No. 95 Civ. 20424, 1998 WL 912026, at *2 (W.D.N.Y. Oct. 16, 1998); *Baxter Diagnostics, Inc. v. Novatek Med., Inc.,* No. 94 Civ. 5220, 1998 WL 665138, at *2–*3 (S.D.N.Y. Sept. 25, 1998). Other times, the motions have been construed as or converted into motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure or motions for summary judgment under Rule 56. *See, e.g., Fonar Corp. v. Domenick,* 105 F.3d 99, 101 (2nd Cir.1997) ("[T]he district court converted the motion into one for summary judgment. . . ."); *Securitron Magnalock Corp. v. Schnabolk,* No. 89 Civ. 6731, at *1 (S.D.N.Y. July 1, 1994). For purposes of efficiency, this Court will address the merits of Fournier's motion.

The fair use doctrine is codified at 17 U.S.C. § 107, and it recognizes that the Copyright Act's goals of encouraging creative and expressive work are best served by permitting reasonable use of otherwise protected material. "The consent of the author of a copyrighted work is implied as to reasonable uses of the copyrighted work 'since a prohibition of such use would inhibit subsequent writers from attempting to improve upon prior works and thus . . . frustrate the very ends sought to be attained' by the copyright laws." *Robinson v. Random House, Inc.,* 877 F.Supp. 830, 839 (S.D.N.Y.1995) (quoting *Harper & Row Publishers v. Nation Enter.,* 471 U.S. 539, 549, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985)). Fair use is a mixed question of law and fact decided on a case by case basis in accordance with the nonexclusive statutory factors enumerated in § 107. *Wright v. Warner Books, Inc.,* 953 F.2d 731, 735 (2nd Cir.1991). The Second Circuit has explained that "[t]he fact-driven nature of the fair use determination suggests that a district court should be cautious in granting [dismissal in advance of trial] in this area; however, it does not protect the copyright holder from summary disposition of her claims where there are no material factual disputes." *Id.*

Section 107 states the applicable doctrine as follows:

> Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include-
>
> > (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> >
> > (2) the nature of the copyrighted work;
> >
> > (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> >
> > (4) the effect of the use upon the potential market for or value of the copyrighted work.
>
> The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

17 U.S.C. § 107.

The Court recognizes the merit in Fournier's claims that the first, second, and fourth fair use factors weigh in his favor because defendants' photograph was used for commercial purposes with minimal, if any, artistic or intellectual value beyond

that of the original work, because Fournier's photographs were unpublished and themselves intended for commercial exploitation, and because the Defendants' photograph has displaced Fournier's principal opportunity for commercial exploitation. *See generally Wright,* 953 F.2d at 736–39; *Maxtone–Graham v. Burtchaell,* 803 F.2d 1253, 1260–65 (2nd Cir.1986). Resolution of the third factor demands greater pause.

Regarding the third factor enumerated in § 107, the Second Circuit has explained that "[t]here are no absolute rules as to how much of a copyrighted work may be copied and still be considered a fair use [and q]uestions of fair use may turn on qualitative assessments." *Maxtone–Graham,* 803 F.2d at 1263; *Wright,* 953 F.2d at 738 ("This factor ... has both a quantitative and qualitative element to it."). The Circuit Court has further explained that "the factor has favored copyright holders where the portion used formed a significant percentage of the copyrighted work ... or where the portion used was 'essentially the heart of' the copyrighted work." *Wright,* 953 F.2d at 738 (quoting *Harper & Row,* 471 U.S. at 565, 105 S.Ct. 2218) (citations omitted). "However, as long as reasonable minds could differ on the issue of substantial similarity, summary [disposition] is inappropriate." *Churchill Livingstone, Inc. v. Williams & Wilkins,* 949 F.Supp. 1045, 1050 (S.D.N.Y.1996); *Rogers v. Koons,* 960 F.2d 301, 307 (2nd Cir.1992) ("[S]uch relief will be denied when the question of substantial similarity is one which reasonable minds could differ."); *DC Comics Inc. v. Reel Fantasy, Inc.,* 696 F.2d 24, 28 (2nd Cir.1982) ("The four factors listed in Section 107 raise essentially factual issues and ... are normally questions for the jury.").

In this case, the degree of similarity between Fournier's protected work and Defendant's advertisement, assuming some degree of infringement for purposes of this

fair use analysis, presents the sort of fact intensive question properly left to a jury to resolve. How much of Fournier's photographs are protected, to what extent Defendants delineated the content of the original work, and to what extent Defendants had access to Fournier's work are among the kinds of factual questions that inform the question of substantiality, both quantitatively and qualitatively. The degree of similarity between the Defendants' photograph and those owned by Fournier, particularly in light of these types of questions, presents a question of fact properly deferred to a jury. For these reasons, Fournier's motion to preclude Defendants' assertion of the fair use doctrine at trial is denied.

## F. EVIDENCE CONCERNING WHAT FOURNIER WOULD HAVE CHARGED TO LICENSE HIS WORK

Section 504(b) of the Copyright Act makes available to the victim of copyright infringement "the actual damages suffered by him or her as a result of the infringement...." 17 U.S.C. § 504(b). As evidence of actual damages, Fournier seeks to offer evidence regarding what he would have charged Defendants for use of his work. Defendants object, claiming that any such evidence is too unreliably self-serving and speculative to be material to the question of actual damages.

The Second Circuit has stated that an award of actual damages in the copyright context "should be broadly construed to favor victims of infringement." *Davis,* 246 F.3d at 165 (citing William F. Patry, *Copyright Law and Practice* 1167 (1994) ("Within reason, any ambiguities should be resolved in favor of the copyright owner.") and 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 14.02 at 14–12 (1999) ("Uncertainty will not preclude a

recovery of actual damages if the uncertainty is as to amount, but not as to the fact that actual damages are attributable to the infringement.")) (other citations omitted). "The question is not what the owner would have charged, but rather what is the fair market value." *Davis*, 246 F.3d at 166. "[T]he copyright owner is competent to testify as to the extent to which the copyright's value has been injured or destroyed by defendant's actions." *Fitzgerald Publ'g Co., Inc.*, 807 F.2d at 1118–19 (citations omitted).

The Second Circuit recognized "that awarding the copyright owner the lost license fee can risk abuse. Once the defendant has infringed, the owner may claim unreasonable amounts as the license fee. . . . The law therefore exacts that the amount of damages may not be based on undue speculation." *Id.* (citation omitted; internal quotations omitted). In this case, speculation can be minimized by evidence of sales figures for Fournier's past work as well as evidence illustrating the progress of negotiations as the parties worked toward a mutually agreeable payment figure. With these kinds of less subjective measures of fair market value in evidence, Fournier may testify as to how much he would have charged for Defendants' use of his work. Such testimony will certainly be self-serving, as Defendants argue, but this point can easily be highlighted to the jury during cross-examination, when Defendants may ask Fournier to justify his asserted fee by relating it to the less subjective evidence of fair market value, including the evidence from the negotiations indicating what the parties considered a reasonable charge; what Fournier re-

ceived from other customers for similar work; and whether a general fee standard prevailed in the industry. *See, e.g., Davis*, 246 F.3d at 166.[3] In addition, such testimony by Fournier can be further anchored by an appropriate jury instruction explaining that Fournier's assertions about what he would have charged are not determinative of actual damages but, rather, one of various pieces of evidence informing that determination.

### G. WATSON'S TESTIMONY

Defendants seek to preclude Watson from testifying as an expert witness because Magistrate Judge Peck already precluded such testimony from her on procedural grounds during a pretrial discovery conference. (*See* Transcript Of Pretrial Discovery Conference Conducted On August 13, 2001, at 1–10.) On this basis, Watson's testimony as an expert is precluded. In the course of those discussions, however, Magistrate Judge Peck addressed the distinction between expert and lay testimony as regards Watson's proffered testimony in a dialogue with Fournier's attorney:

MR. WEINGRAD: She is going to be testifying with respect to the value or the fee that she would have charged or that would be fair and reasonable in the industry based on the amount of media that is being purchased.

Her testimony was that first she was told that it was—a media buy was $2.2 million. Then they were attempting to reduce the licensing fee. So they worked in a series of faxes

---

3. On this point, the Second Circuit explained: In order to make out his claim that he has suffered actual damage because of the infringer's failure to pay the fee, the owner must show that the thing taken had a fair market value. But if the plaintiff owner has done so, and the defendant is thus protected against an unrealistically exaggerated claim, we can see little reason not to consider the market value of the uncollected license fee as an element of 'actual damages' under § 504(b). *Davis*, 246 F.3d at 166.

and conversations down to a media of $300,000.

THE COURT: All of which is fact testimony.

MR. WEINGRAD: That is fact testimony. Now they come up with a document that says the media buy is $5.2 million and it has codes on it.

THE COURT: What makes her an expert on that as opposed to a fact witness who would say, perhaps, as the agent for the plaintiff, if I had known it was a five point something million dollar ad buy, I would have charged them X?

(*Id.* at 8.)

The Court agrees with Magistrate Judge Peck's general conclusions. Watson can testify as a lay witness as to matters about which she has personal knowledge, including what she charged and would have charged Defendants for use of Fournier's work. The Court notes that Watson may not offer opinions that require specialized knowledge and, therefore, her testimony must be confined to matters of her perception and experience like any other lay witness. While she may testify about the method by which she determines the amount of a licensing fee, she may not respond to questions by Fournier attempting to relate her calculus to industry standards or the like. Defendants are of course free to object to questioning that deviates from these restrictions, and the Court will rule on such objections in context at trial.

Defendants also seek to preclude Watson from testifying about similarities between the Defendants' advertisement photograph and Fournier's work. To the extent such questioning would be framed so as to elicit answers suggesting specialized knowledge as an expert, for the reasons stated, such questioning is not permitted. To the extent that Watson is presented with questions eliciting her as-sessment of the degree of similarity as a lay witness, such questioning is likely to be deemed conclusory, as the issue of similarity is for the jury to determine. Nonetheless, certain questions eliciting descriptive answers regarding aspects of the photographs' content may be permitted. These matters are all too indeterminate at this stage to resolve definitively and will be addressed in accordance with the guidelines stated above as objections are raised in context at trial.

## H. *AMENDING THE JOINT PRE-TRIAL ORDER TO INCLUDE ADDITIONAL EXHIBITS*

Fournier seeks an order modifying the Joint Pretrial Order to add five additional exhibits.

### 1. *Chart And Addenda Showing The Circulation Of Each Magazine In Which Defendants' Advertisement Was Published*

Defendants object to this document, (Notice Of Motion dated October 29, 2002, Ex. B), arguing that it is hearsay and that it is not relevant to the issue of damages. The Court concludes that this document is relevant to the question of damages in that § 504(b) provides for recovery of " . . . any profits of the infringer that are attributable to the infringement . . .," and the chart and addenda inform the jury as to the extent of the Defendants' alleged misappropriation. Furthermore, Fournier has proffered that Watson will testify about her practice of calculating licensing fees, a method that depends in part on the extent of the media circulation contemplated by the licensee. Fournier represents that the chart he proposes to introduce merely summarizes information publically available on the Internet web pages of the relevant publications. Defendants, apart from characterizing this chart as "unidentified," do not dispute this representation

and, accordingly, the Court will accept it as true. Accordingly, the Court concludes that this chart and addenda are relevant to matters in dispute and fall within the purview of Rules 803(17) and 1006 of the Federal Rules of Evidence. For these reasons, Defendants' objections to this material based on relevancy and hearsay are overruled.

2. *Pickerell And DiFrank's Negotiating Stock Photo Prices, pp. 194–95; Terms And Conditions Governing Delivery of Photographs By The Stock Market Photo Agency, Inc.; And Corbis Corporation Standard Terms And Conditions*

█ Fournier offers these exhibits, (Notice Of Motion dated October 29, 2002, Ex. C–E), as evidence of industry practice regarding the calculation of retroactive licensing fees. Defendants object on grounds of hearsay and on the basis that Fournier's expert on damages, who was to have relied in part on these documents, has been precluded. Defendants also claim that these documents do not establish that the multiplier based calculus they present are actually applied in the marketplace.

Magistrate Judge Peck precluded Fournier's expert, Henri Dauman ("Dauman"), from testifying on the question of actual damages because he concluded that Dauman has no relevant expertise, explaining:

But Dauman is not saying anything other than Fournier wanted $95,000 for a $2 million media buy.... If the media buy is larger, he would have asked for more. If that's legitimate, let Fournier say it.... This guy has no expertise that is explained in this report as to where he got that from.

(Transcript of Pretrial Discovery Conference Conducted On September 7, 2001, at 17.) This decision does not implicate the independent admissibility, if any, of the three documents presently at issue.

Defendants oppose the admission of these three documents on the grounds that Fournier offers no evidence that the multipliers they discuss are actually applied or recovered in practice. This argument is not a proper basis to preclude the proposed documents. Rather, this point is one properly made to the jury to consider in evaluating the weight to accord the given documents.

Defendants' objections to these documents based on hearsay are unfounded because the specific matters asserted, namely, whether Corbis Corporation or The Stock Market Photo Agency, Inc. actually use multipliers in setting retroactive licensing fees in any given case, are not material facts in dispute in this case. Rather, it is the inclusion of the excerpted provisions referencing multipliers in these third-party industry contracts that Fournier seeks to introduce as evidence in support of his assertions concerning market value and damages, specifically, that industry practice entitles him to a multiplier in the event of unauthorized use.[4] In fact,

---

4. Furthermore, even if these documents were offered for the truth of the matters asserted, and while the briefing on the admissibility of these documents is particularly thin, it appears to the Court that the two "terms and conditions" excerpts are boilerplate portions of standard licensing agreements utilized by The Stock Market Photo Agency, Inc., and Corbis Corporation. For this reason, Defendants' objection to these documents as hearsay would likely be overruled pursuant to Rule 803(6) of the Federal Rules of Evidence.

Similarly, Fournier represents that he and Watson will testify to the reliability of the proposed Pickerell and DiFrank exhibit. (Plaintiff's Memorandum Of Law In Reply To Defendant's [sic] Opposition To The Plaintiff's Motion *In Limine* To Unseal Confidential Documents And Other Relief dated December 30, 2002, at 6.) While neither has been recognized as an expert for purposes of their trial testimony in this case, the Court appreciates that they, along with Dauman, are experi-

Defendants' argument above that Fournier fails to establish that the multipliers referenced in these excerpts are actually applied in the marketplace itself presumes this distinction between the truth of the matters asserted and evidence of industry practice.

In Defendants' Notice Of Motion *In Limine* dated October 4, 2002, at ¶ 3, Defendants seek an order "[p]recluding Fournier from arguing to the jury or introducing evidence that he is entitled to apply a multiplier of up to 10 times a reasonable license fee, in the form of a retroactive license fee, because there is no expert or other evidentiary basis to support such a multiplier." (*See also* Defendants' Memorandum Of Law In Support Of Motion *In Limine* To Preclude Recovery Of Defendants' Profits And For Other Relief dated October 4, 2002, at 23.) In light of the foregoing discussion in which Defendants' objections to documents addressing this very point, documents specifically raised in Fournier's Notice Of Motion dated October 29, 2002, are overruled, Defendants' argument that "there is no evidentiary basis to support such a multiplier" presumes a mistaken premise. For this reason, that portion of Defendants' motion *in limine* seeking an order precluding generally evidence or testimony of a multiplier must be denied.

### 3. *Report Of Microsoft's Earnings For The Years 2000–2001*

■ For the reasons stated in Section II.B *infra*, this information, (Notice Of Motion dated October 29, 2002, Ex. F), is not reasonably related to the precise infringement at issue because it reflects all of Microsoft's earnings and is not restricted to those derived from the Windows 2000 product line. Therefore, the Court concludes that this report, without some basis to narrow the earnings information presented, is overbroad in scope and, therefore, not relevant to the question of damages, and that admitting it would be needlessly prejudicial to Microsoft. For these reasons, Defendants' objections to the admission of this report of Microsoft's earnings under Rules 401 and 403 are sustained.

### I. *UNSEALING DOCUMENTS*

■ In a Stipulated Protective Order dated October 3, 2002 (the "Stipulated Protective Order"), the parties provided for the designation of material produced during discovery as protected material to be filed under seal. Fournier now seeks an order unsealing these documents. Defendants object, arguing that Fournier has offered no compelling reason to unseal the given documents.

American courts have historically recognized the right to access public records and documents, including evidence in a civil trial, in order to "keep a watchful eye on the workings of public agencies." *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978); *see United States v. Amodeo*, 44 F.3d 141, 145 (2nd Cir.1995). This right, however, is not absolute. *See Nixon*, 435 U.S. at 597, 98 S.Ct. 1306; *Amodeo*, 44

---

enced professionals in the fields of photography and advertising and, accordingly, would be inclined to take judicial notice of this excerpt as part of a "learned treatise" pursuant to Rule 803(18). Given the meager discussion of this issue in the parties' motion papers, however, the Court would likely require supplemental affidavits by individuals selected by the parties: (1) commenting on either the standing of the authors in the industry, the popularity of the book, or the prominence of the specific excerpt's recommended practice; and (2) stating each affiant's professional background and the nature of any basis to offer such comment. The Court would then weigh the parties' submissions solely for purposes of determining the excerpt's reliability as a learned treatise under Rule 803(18).

F.3d at 145. The Second Circuit has recently summarized the law concerning sealing and unsealing evidence as follows:

> [W]hen a district court initially considers a request to seal a file or to approve or take other protective measures, it enjoys considerable discretion in determining whether good cause exists to overcome the presumption of open access to documents filed in our courts. However, after a district court has approved a sealing order, discretion of that breadth no longer exists. Although a district court has power to modify a protective order ..., the required showing must be more substantial than the good cause needed to obtain a sealing order in the first instance. "Absent a showing of improvidence in the grant of a Rule 26(c) protective order or some extraordinary circumstance or compelling need ... a witness should be entitled to rely upon the enforceability of a protective order...."

*Geller v. Branic Int'l Realty Corp.*, 212 F.3d 734, 738 (2nd Cir.2000) (quoting *Martindell v. Int'l Tel. & Tel. Corp.*, 594 F.2d 291, 296 (2nd Cir.1979)) (citation omitted); *see In re "Agent Orange" Prod. Liab. Litig.*, 821 F.2d 139, 147–48 (2nd Cir.1987).

In this case, however, the Stipulated Protective Order not only asked the Court to defer to the parties' judgment on confidentiality but it also allowed for unilateral designation of an exhibit as protected material, and it did not list specific documents, or delineate the kinds of documents, contemplated for protection. Defendants were never required to show good cause for sealing the various documents. This is the same kind of deference and pervasive protection without Court review that the Second Circuit found to constitute "extraordinary circumstances" justifying the unsealing of documents. *See In re "Agent Orange" Prod. Liab. Litig.*, 821 F.2d at 147–48. In *In re*

*"Agent Orange" Prod. Liab. Litig.*, the Circuit Court stated:

> Under the February 6, 1981 order, appellants needed only to designate discovery materials as confidential to protect them.... We conclude that the exceptionally pervasive protection granted appellants ..., coupled with the fact that appellants never were required to show good cause as mandated by Rule 26(c), amounts to the type of extraordinary circumstances contemplated by our prior decisions.

*Id.*

Furthermore, the Stipulated Protective Order itself includes a provision for resolving future disputes that may arise. The plain language reflects an understanding that, if the parties are unable to resolve a dispute among themselves, the Court will address the matter *de novo*. *See Geller*, 212 F.3d at 737–38 (stipulated confidentiality orders, once "so ordered," are to be interpreted according to their plain language); *City of Hartford v. Chase*, 942 F.2d 130, 135 (2nd Cir.1991) (same); *Encyclopedia Brown Prod., Ltd. v. Home Box Office, Inc.*, 26 F.Supp.2d 606, 611 (S.D.N.Y.1998) (plain language of protective orders provided for *de novo* review of sealing matters). The Stipulated Protective Order states in relevant part:

> [T]he parties will first try, in good faith, to resolve such dispute on an informal basis before presenting the dispute to the Court by motion or otherwise. The Court may then determine whether the information should be considered Protected Material and, if so, may rule on what restrictions to access or disclosure should be imposed, if any. No party shall be obligated to challenge the propriety of the designation of Protected Material at the time of production, and a failure to do so shall not preclude a

subsequent challenge as to the propriety of such designation.

(Stipulated Protective Order, ¶ 10.)

This excerpt recognizes the highly deferential nature of the designations made by the parties in the first instance and in the absence of disagreement. The language, "The Court *may then determine* whether the information *should be considered* Protected Material ..." (emphasis added), is notable. The former wording, "may then determine," indicates that the Court will not have even reviewed the designated material prior to the dispute having arisen. The latter language, "should be considered" indicates that the Court's evaluation will not be for purposes of continuing the protection to which the parties had stipulated but, rather, to determine the appropriateness of protection *de novo*. Similarly, the provision that no party is required to challenge a document designated as protected at the time of production further indicates that the parties contemplated that the Court would review each disputed designation *de novo*. Otherwise, each party could circumvent the "good cause" standard for protection and, simultaneously, shift the burden to his adversary to *unseal* a document while benefitting from the more rigorous "extraordi-

nary circumstances" standard that would apply merely by unilaterally designating any given document as protected.[5] This is not a reasonable interpretation of the parties' intent, and is at best an unforseen consequence producing the kind of extraordinary circumstance which, together with the deference discussed above, compels a reconsideration of the initial sealing arrangement and subsequent designations.

For these reasons, the Court concludes that the heightened "extraordinary circumstances" burden for unsealing documents, which contemplates the Court already having considered each document in the first instance according to a "good cause" standard, is not appropriate given the open-ended and unilateral deference to the parties, the plain language of the Protective Order, and the implications of a contrary interpretation. Because of the extensive deference accorded to the parties under the Stipulated Protective Order as explained above, and because the parties' briefing addresses this matter with only a general focus, the Court has never had an opportunity to consider arguments concerning each specific document. In consequence, the Court has no basis to seal them indefinitely.[6] Accordingly, the Court will vacate the Stipulated Protective Order

---

**5.** In this vein, Defendants themselves explain that the documents affected were produced some sixteen months before the Stipulated Protective Order was executed, and Fournier moved to unseal these documents within only one month of the Stipulated Protective Order's execution. If public disclosure of the designated documents were so prejudicial to Defendants, they do not explain why they would wait so long before endeavoring to protect their confidentiality. Additionally, because the Stipulated Protective Order delineates the process for resolving disputes as above, the parties were on notice that their initial designations were subject to review and adjustment by the Court.

**6.** Any further motion practice on this matter must correct this state of affairs by specifical-

ly identifying each document at issue and making arguments specifically pertaining to each one. In this vein, the Court notes that many of the documents designated for protection under the Stipulated Protective Order have been precluded on evidentiary grounds for reasons explained in earlier portions of this Decision and Order. Of those that remain, the majority have survived objections by Defendants under Rule 403 of the Federal Rules of Evidence. Accordingly, any further motion practice seeking to seal these exhibits must present arguments in support of confidentiality that exceed Defendants' assertions of unfair prejudice under Rule 403, which have already been considered and rejected in that context.

to unseal, as of the commencement of trial, all documents presently sealed thereunder.

## III.  DECISION AND ORDER

For all of the reasons discussed above, and subject to the conditions there explained, it is hereby

**ORDERED** that the portion of Defendants' motion seeking a general ruling barring Fournier from recovery of Defendants' profits and precluding him from introducing projected of actual revenues, expenditures, and fees is denied; and it is further

**ORDERED** that Defendants' objections to the admission into evidence of Plaintiff's Exhibits 3, 3A, 5, 7, 18, 19, 20A, 21, 22, 23, 30, and 40 are overruled; and it is further

**ORDERED** that Fournier is directed to verify the composition of the exhibit he intends to identify as Plaintiff's Exhibit 19 both to Defendants and the Court within three days of the date of this Order, and, if the intended composition is not the three photographs contemplated in Section II. A.7 *infra* but, rather, the two photograph compilation described in the Joint Pretrial Order, Fournier is further directed to include in his clarification a color copy of that item or items; and it is further .

**ORDERED** that Defendants' objections to the admission into evidence of Plaintiff's Exhibits 18A, 19A, 20, 24, 25, 26, 27, 28, 29, 32, 33, 34, 35, 36, 37, 38A, 41, 42, and 43 are sustained; and it is further

**ORDERED** that Fournier's motion to compel Defendants to respond to Fournier's Request For Admissions dated September 30, 2002 is denied; and it is further

**ORDERED** that Fournier's motion to amend the Joint Pretrial Order and admit into evidence the two-page Copyright Registration Certificate No. VAU–489–018 issued to Fournier by the United States Copyright Office is granted; and it is further

**ORDERED** that Fournier's motion to exclude Defendants' assertion of the fair use defense at trial is denied; and it is further

**ORDERED** that Defendants' motion seeking to preclude Fournier from testifying ·as to what he would have charged Defendants to license his work is denied; and it is further

**ORDERED** that Defendants' motion to preclude expert testimony by Patricia Watson is granted in accordance with Magistrate Judge Peck's order of August 13, 2001, though Watson may testify as a lay witness; and it is further

**ORDERED** that Defendants' motion seeking to preclude Fournier from offering evidence of and arguing to the jury that he is entitled to a multiplier of a reasonable license fee, as a retroactive license fee, is denied; and it is further

**ORDERED** that Fournier's motion to modify the Joint Pretrial Order and admit into evidence a chart identifying the circulation of the magazines in which Defendants' advertisement was published together with the relevant magazine web pages, a two-page excerpt from *Negotiating Stock Photo Prices* by Pickerell and DiFrank, and excerpts from the "terms and conditions" sections of licensing contracts utilized by The Stock Market Photo Agency, Inc. and Corbis Corporation is granted; and it is further

**ORDERED** that Fournier's motion to modify the Joint Pretrial Order and admit into evidence a report of Microsoft's annual earnings for the years 2000–2001 is denied; and it is finally

**ORDERED** that Fournier's motion to unseal all exhibits sealed pursuant to the

Stipulated Protective Order dated October 4, 2002 is granted.

**SO ORDERED**.